(December 20, 1983)

■ Clara Ellison, as Administratrix of the Estate of Joseph Eastman, Deceased, Respondent, v New York City Transit Authority, Appellant. — Judgment of the Supreme Court, New York County (Andrew Tyler, J.), entered on October 15, 1982, following a nonjury trial, which found in favor of the plaintiff in the sum of $750,000, plus interest, costs and disbursements, is affirmed, without costs and disbursements. According to the trial testimony of Stephen Randolph, an independent eyewitness to the incident which is the basis for the instant action, he had just disembarked from a southbound subway train when he observed plaintiff's decedent, Joseph Eastman, on the platform. Eastman was staggering and mumbled something indistinguishable to Randolph. Walking past Eastman, Randolph heard a thud, then turned around to discover that the platform was now empty. He looked down into the tracks, noticing that the decedent was lying motionless, though conscious. After futilely attempting to induce the decedent to climb to safety, Randolph jumped down into the roadbed and endeavored to help the other man back up to the platform. Randolph was not successful in this effort, so instead he aided Eastman into an upright position with both of his arms resting on the platform. Advising the decedent to remain standing, he then departed to seek assistance. Randolph proceeded to make his way to the token booth where he encountered a clerk who was engaged in emptying tokens from the turnstiles. Although informed that a man was on the tracks, the clerk continued collecting the tokens for another three to five minutes before finally returning to the booth to place an emergency telephone call. Randolph waited near the booth until the police officers arrived, some 15 minutes after he had first seen Eastman on the tracks. Following behind the officers, Randolph reached the platform only to find that a train was already in the station, and passengers were stepping out of the cars. The decedent, who was subsequently removed on a stretcher from beneath the train at the approximate spot that the witness had left him, was taken to St. Vincent's Hospital. As a result of the accident, both of his legs were severed and amputated. He died some three years later from unrelated causes. Since the defendant's motorman was not produced in court, testimony taken from him prior to trial was read into the record. The motorman denied having noticed Eastman on the tracks despite the fact that the station in question was well lit. The court, after visiting the station and inspecting its layout and lighting conditions, determined that the motorman was negligent in failing to perceive what should have been obvious to the eye — the decedent on or near the tracks at the other end of the platform. Moreover, had the motorman made the proper observation, he would have had the opportunity to stop the train in time to avoid the accident. The court also concluded that the defendant's representative was negligent in not responding more promptly to Eastman's predicament, particularly after receiving actual notice that he was on the tracks. Rejecting defendant's concerted efforts to demonstrate that the decedent had been drunk and, therefore, contributorily negligent, the court held that Eastman's staggering and his unexplained fall

onto the tracks were not in and of themselves objective proof of intoxication and, further, that the statement by one of the responding officers that he smelled alcohol on the decedent's breath after the accident was insufficient to warrant a finding of contributory negligence. The trial court in its decision also observed: "[N]ot only was the defendant's representative negligent in failing to respond to the decedent's plight on the tracks for some 10 to 12 minutes *after* he fell onto the tracks, and *after* receiving actual notice of his predicament, but [was] further negligent in that Mason, who was the motorman operating the training [*sic*] entering the station, failed to see what was obvious to be seen, the decedent on or near the tracks at the other end of the platform. There is no doubt in this Court's opinion that Mason, had he made the proper observation which he was chargeable with, had the opportunity to stop the train and avoid this accident." (Emphasis added.) Defendant contends, and the dissent agrees, that the record contains compelling proof of contributory negligence on the part of decedent. However, an examination of the evidence does not support such a conclusion. Notwithstanding the attempt by counsel for defendant New York City Transit Authority to depict Eastman as "incoherent", that characterization was never applied by Randolph, a witness to the events at issue. When plaintiff's attorney protested the use of the description "incoherent" as leading, the court sustained the objection. Thus, the witness himself merely stated that the decedent had mumbled something. The court specifically asked Randolph whether he had smelled alcohol on the decedent's breath, and Randolph replied that he had not. In response to a question concerning his observations of Eastman, Randolph declared that "I thought overall that he was drunk." Plaintiff's lawyer then moved to strike the answer, and the court reserved decision. Ultimately, the court decided that the evidence was inadequate to show that the decedent had been intoxicated. Defendant also endeavored at trial to demonstrate the existence of notations in the hospital records that the decedent was intoxicated and that he was receiving medication to relieve his delirium tremens. Here, again, the proof at trial does not sustain this assertion. Dr. David Solomon, who testified about Eastman's hospital records, was queried as to the meaning of the letters "E.T.O.H." He stated that he did not know, at which point the following exchange occurred: "Q. [by defense counsel]: Doesn't it stand for alcohol. MR. FRANK [plaintiff's attorney]: I'm going to object to that as incompetent, move to strike out the remarks of counsel. If he had such a history it's not admissible and it's not a basis for — THE COURT: Sustained." Shortly thereafter, the defendant's attorney once again tried to demonstrate that the hospital records included a reference to decedent's intoxication, this time with regard to the letters "R.O." In reading from the hospital record, defense counsel asserted: "Impression: Traumatic amputation of lower extremities following the train accident. R.O., alcohol abuse. MR. FRANK: I move to strike that out, Judge. THE COURT: Granted. MR. FRANK: Not admissible. Q. [by defendant's lawyer]: Doctor — MR. FRANK: R.O. means to rule out. MR. LEVY [defense counsel]: It's record of." Thus, except for the defense attorney's repeated and unavailing attempts to interpret the hospital records as indicating that the decedent was drunk at the time of the accident, there is nothing in either Dr. Solomon's testimony or the hospital reports themselves to bear out the defendant's contention. Although there is mention in the reports of alcoholic detoxication, defendant's treatment in that respect took place long after the subway incident and can have no relevance to whether he was drunk at the time of the accident itself. Similarly, defendant's lawyer endeavored to connect the fact that Eastman was given certain medication with his purported alcoholism. He was not, however, successful in establishing any such link. Defendant also alludes to the initials "A.O.B." contained in the ambulance call report as standing for

"alcohol on breath." However, the meaning of "A.O.B." can only remain a matter of speculation since the trial transcript is entirely silent with respect not only to the letters "A.O.B." but the ambulance call report itself. Consequently, there was no evidence introduced at trial to show decedent's intoxication on the date in question. No one claimed to have seen decedent consume any alcoholic beverages; no blood test was administered to him (or, at least, none that is in the record) which would demonstrate a state of inebriation. Thus, the only support in the record for defendant's position is that Eastman was staggering, and, certainly, there are other explanations for the decedent's being unsteady on his feet — for instance, sudden dizziness or faintness caused by illness — than merely drunkenness. In fact, Randolph's statement to defendant's representatives made shortly after the accident did not contain a reference to decedent's possible intoxication, nor did a later statement provided to defendant's attorneys. As to the belated claim by Officer Angelo Balzano, one of the policemen present at the scene, that he smelled alcohol on Eastman's breath and clothing, he neglected to mention any such thing in the handwritten notes which he made at the time of the accident. While it may be true that Balzano completed an "AIDED REPORT" on the date of the occurrence which made mention of the decedent's possible intoxication, the court, apparently believing that the information in this report was largely derived from statements provided by witnesses rather than based on the officer's personal observations, excluded the reference to intoxication. Regardless of whether or not the court's action in this respect was proper, defendant, while critical of certain of the court's evidentiary rulings, has not directly challenged them on appeal. Thus, our review herein is limited to the record as it currently exists. The defendant, moreover, failed to produce any other witnesses who had made the same olfactory observation as did Balzano despite the fact that four persons were carrying the stretcher bearing decedent to the hospital, all of whom were at least as physically close to Eastman as was Officer Balzano. Even Balzano, as indicated by his cryptic remark that, "I did not say drunk, I said intoxicated", hedged as to the decedent's condition at the time of the accident. Unfortunately, the court's effort to elucidate the meaning of that comment was not notably fruitful. Assuming, nonetheless, that Balzano's testimony warrants a finding that Eastman had been drinking, that is clearly not adequate to establish drunkenness. Certainly, a person's having imbibed some alcoholic beverage does not alone indicate a condition of intoxication. (*Coleman v New York City Tr. Auth.*, 37 NY2d 137.) In *Coleman* (*supra*, p 144) the Court of Appeals explained that the "evidence of alcoholic breath and the three drinks is not in itself proof of intoxication". Here, there is some evidence of alcoholic breath, though not exactly an overwhelming amount, no evidence at all that the decedent had had anything to drink, as well as testimony that Eastman was, for some unexplained reason, staggering. That is scarcely proof sufficiently compelling to overturn a determination by the trier of the facts, whose function it is to assess the weight of the evidence and the credibility of the witnesses. (See *Dominguez v Manhattan & Bronx Surface Tr. Operating Auth.*, 46 NY2d 528.) However, even assuming that the decedent was intoxicated to some degree, the proof demonstrated that such intoxication was not the proximate cause of the accident. Concur — Asch, Fein and Milonas, JJ.

Murphy, P. J., and Kassal, J., dissent in part in a memorandum by Murphy, P. J., as follows: The trial court's conclusion that the decedent was not contributorily negligent is against the unchallenged evidence presented at trial. In the claim form signed by the decedent and filed with the defendant, the decedent alleged in the third paragraph: "The claim arose on or about March 10, 1979 at 11:00 P.M. at the Bleeker Street Station of the Lexington Avenue subway line when plaintiff was pushed onto tracks and struck by

oncoming train by unruly crowds, irrational persons under the influence of foreign substances." A similar claim was made in paragraph 5 of the complaint: "5. The defendant was negligent, reckless and careless in that it failed to comply with its duty as a common carrier and provide adequate and proper protection for its passengers from unruly and dangerous persons, and in that it failed to maintain adequate safeguards and security guards and protection for its passengers on its platforms." At trial, the plaintiff abandoned this theory of recovery. Furthermore, she did not advance any explanation for the decedent's "staggering" or his fall from the platform to the tracks. Plaintiff's failure to go forward on this critical point is understandable because the unrebutted evidence demonstrated that the decedent was intoxicated. Stephen Randolph, the eyewitness, testified that he did not recall smelling the decedent's breath. Randolph observed the decedent staggering in a circle. Before the decedent fell upon the tracks, he mumbled to Randolph. However, Randolph did not understand what the decedent had mumbled. After the decedent had fallen on the tracks, the decedent responded to Randolph "in terms of hmm hmm hmm or yeah or a huh. There were not any sentences." Randolph thought that, overall, the decedent was drunk. The trial court asked whether it was fair to say that, from his observations, decedent was not in a normal state of health; Randolph replied in the affirmative. Randolph's testimony was buttressed on this point by that of New York City Transit Police Officer Angelo Balzano. After the decedent had been struck by the train, Balzano responded to the scene of the occurrence. He later accompanied the decedent to the hospital in an ambulance. During this period of attendance, Balzano smelled alcohol on the decedent's breath and clothing. In Balzano's opinion, the decedent had consumed a heavy amount of alcohol. Balzano also completed an "AIDED REPORT" on the date of the occurrence. The portion of the "AIDED REPORT" labeled "DETAILS" read as follows: "Aided apparently intoxicated, was seen on the tracks by above witness, who attempted to pull aided to platform. Aided [sic] was unable to pull aided due to the aided's weight. Witness departed scene to summons [sic] help and upon his return Aided had been hit by a S/B # 6 train. Aided removed to Saint Vincent's Hospital via Ambulance, alive." The trial court excluded that entire paragraph except for the portion that read "Aided removed to Saint Vincent's Hospital via Ambulance, alive." The trial court did not specify a particular reason for striking the first part of the paragraph under "DETAILS". The trial court, *sua sponte,* concluded that Balzano had relied upon the statements of witnesses in preparing the "AIDED REPORT". There is no evidence in the record that Balzano relied upon any statement that did not accurately reflect the decedent's demeanor and condition on March 10, 1979. There is an indication that Balzano did speak with Randolph. As was recounted above, Randolph's own impressions as to the decedent's inebriation could only have strengthened Balzano's own opinion in that matter. The trial court incorrectly struck the portion of the "AIDED REPORT" that further confirms the decedent's intoxication. The "AMBULANCE CALL REPORT" is apparently signed by the crew chief of the ambulance; the signature of the crew chief on that form is not readable. The crew chief checked a box on that form which read "A.O.B." The Acronyms and Initialisms Dictionary ([3d ed, Crowley and Thomas], p 38) lists one definition for A.O.B. as follows: "Alcohol on Breath (Police term)". Clearly the individual who completed the "AMBULANCE CALL REPORT" recognized that the decedent had been drinking alcohol. Additional substantiation for the decedent's inebriation is found in the "HISTORY and PROGRESS NOTES" of St. Vincent's Hospital. Again, it is very difficult to identify the particular doctors or nurses who signed the various handwritten records. On March 10, 1979, there is a notation "ETOH on breath." The abbreviation "ETOH" represents ethyl alcohol or ethanol (10 Houts, Proving Medical Diagnoses and

Prognoses, 702-9). Thus, one of the attending staff members of St. Vincent's recognized that the decedent had alcohol on his breath. The "HISTORY and PROGRESS NOTES" for March 13 indicate "Pt. in DT's". In other words, the decedent was suffering from delirium tremens. On March 14, it was observed that "Pt still in DT's". The decedent was still suffering from delirium tremens on that date. On March 16, it was recommended to "cont Detox". Detoxification was to continue. The "PHYSICIAN'S ORDER FORMS" also substantiate that the decedent was intoxicated immediately after his admission. On March 10, librium in doses of 25 milligrams was to be administered every four hours as part of the alcohol detoxification program. The librium was continued on March 11 for detoxification purposes. In the years following the occurrence, the decedent was treated in St. Vincent's, St. Luke's, and Goldwater Hospitals. The defense attorney attempted to show at trial that decedent was not only treated at those hospitals for the loss of his legs, but that he was also placed in the hospitals' detoxification centers from time to time. The trial court refused to consider, as probative, those portions of the hospitals' records which showed that decedent was, intermittently, in detoxification programs. This was additional error on the part of the trial court. Those portions of the hospitals' records should, at the very least, have been considered as possible proof that decedent was an alcoholic on the date of the occurrence. At most, these portions were some evidence suggesting that the decedent was an alcoholic and was intoxicated on March 10, 1979. It is highly unlikely that decedent became an alcoholic during his continuous confinements in the hospitals after the incident. It is true that defendant did not call any witness who saw the decedent drinking on the date of the occurrence. There is, of course, no proof that decedent was, in fact, seen "drinking" by any other individual on that day. It is also true that the doctors at St. Vincent's Hospital did not order a test of the alcoholic content of decedent's blood. Those doctors were evidently more concerned with removing decedent's legs and saving his life. It was the universal opinion of all who observed, assisted or examined decedent on March 10, 1979 that he was intoxicated. Plaintiff did not submit any evidence at trial to even suggest a different conclusion. The decedent should have been found contributorily negligent to the extent that he was one third responsible for his own injuries. Accordingly, the award should be reduced by the sum of $250,000 to make the total award $500,000.